**UNITED STATES ex rel. SAGE v. DISTRICT DIRECTOR OF IMMIGRATION.**

No. 5670.

Circuit Court of Appeals, Seventh Circuit.

March 19, 1936.

Grenville Beardsley and Thomas J. Johnson, Jr., both of Chicago, Ill., for appellant.

Michael L. Igoe, U. S. Atty., and A. Bradley Eben, Asst. U. S. Atty., both of Chicago, Ill., for appellee.

Before EVANS, Circuit Judge, and BRIGGLE and HOLLY, District Judges.

This appeal is from an order dismissing appellant's petition for a writ of habeas corpus and remanding her to the custody of the District Director of Immigration for deportation.

EVANS, Circuit Judge.

The appellant, Sage, an alien who is a native and subject of Roumania, entered the United States for a second time some time in October, 1924. She was never naturalized. On June 22, 1932, she was arrested at Chicago by an immigration inspector pursuant to a warrant issued by the Secretary of Labor, bearing the date of June 22, 1932. She was granted a hearing and thereafter was found by the Assistant Secretary of Labor to be in the United States in violation of the Immigration Act of February 5, 1917 (8 U.S. C.A. § 155), in that "she has been found managing a house of prostitution; and that she has been found practicing prostitution subsequent to her entry." Thereupon an order, dated June 12, 1933, was entered directing her deportation, and she was taken into custody to be deported. This petition for habeas corpus followed.

Avoidance of the order of deportation is sought by appellant principally on the ground that she entered into an agreement with representatives of the government whereby she agreed, in consideration of the Government's agreement to vacate the order of deportation and dismiss the proceedings, to assist in the apprehension of one Dillinger, described as a dangerous, defiant criminal, who, the Government believed and charged, was responsible for the robbery of several national banks, the murder of numerous persons committed during said robberies, was guilty of transporting stolen automobiles and stolen property in said automobiles, and who, at the time, was at large. His apprehension was much sought. Appellant offered to prove that she became acquainted with Dillinger and knew of his whereabouts in Chicago; that she immediately communicated this information to the Government and agreed to aid the Government in his capture, if the Government would withdraw the deportation warrant and dismiss the deportation proceedings against her; that she agreed to and did co-operate with the Government, at great danger to herself and even at the risk of death at the hands of Dillinger and his associates; that she gave the necessary information and rendered the fullest co-operation with the Government officers in arranging the time and place where the agents might arrest the said Dillinger. She further asserted that the Government agents accepted her proposal and agreed to pay her $5,000 in cash (part of reward previously offered) and

secure the discharge of the deportation order, provided she would carry out her agreement and lead said Dillinger to a designated place at the time agreed upon. Appellant further alleges that she led the said Dillinger to the spot at the time designated and, through the use of signs, informed said agents that the much sought fugitive was her escort; that the officers attempted to arrest Dillinger and, in so doing, Dillinger was shot and as a result died.

In its return to the petition for habeas corpus the Government emphatically denied that it made any promise such as was alleged in the petition and denied that it had agreed to set aside the order of deportation or dismiss the deportation proceedings, if appellant assisted in delivering said Dillinger to the officers who were seeking him.

On the hearing before the District Court, appellant offered to prove the allegation of her petition; namely, that she talked to one Melvin Purvis, an agent in charge of the Chicago office, and to Samuel Cowley, special investigator of the Department of Justice, who was in charge of the search for the escaped convict, Dillinger, and that she gave to them the information which led to Dillinger's apprehension and further that she participated in his apprehension; that she did so pursuant to an agreement with said Government officials to dismiss the deportation proceedings which were pending against her. She further offered to prove that the officers aforenamed gave her $5,000 (part of aforementioned reward) for the assistance she rendered in the apprehension of said Dillinger.

The court refused to hear any of such evidence on the ground that the officers of the Government named had no authority to bind the Government assuming that they agreed to do so. In other words, it was the court's position that the evidence was irrelevant because such an agreement, if established, would not have been binding on the government or effective as a valid estoppel against it.

Appellant also advanced the objection that she is the wife of an American citizen and therefore not subject to deportation.

■ As to the latter objection, this court has directly held [Smith v. United States ex rel. Grisius, 58 F.(2d) 1] that an alien is subject to deportation for cause shown, even though she be the wife of an American citizen.

It might also be said that in the present case the evidence does not show appellant to be the wife of an American citizen. The evidence, while not entirely conclusive, tended to show that appellant was first married to one Chiolak in Roumania in 1909. She and her husband came to the United States, and her husband was naturalized in 1922. A divorce was granted. Appellant returned to Roumania and subsequently entered the United States. She married a second time, but was separated from her second husband. It does not, however, clearly appear whether this man was an American citizen, although it does appear that she, prior to her separation from him, conducted houses of ill fame in her own name and was twice convicted therefor.

■ Appellant's chief assignment of error is based upon her assumption that the court should have given effect to the asserted agreement made by the Government officials with her. In disposing of this assignment, we must assume, because the court refused to hear the evidence, that had appellant been permitted so to do, she could have proved that such an agreement, as alleged, was made.

Its validity, however, would, of necessity, depend upon the authority of the officials of the Government to make the agreement. As stated in the recent decision in Wilber National Bank v. United States, 294 U.S. 120, 55 S.Ct. 362, 364, 79 L.Ed. 798:

"Undoubtedly, the general rule is that the United States are neither bound nor estopped by the acts of their officers and agents in entering into an agreement or arrangement to do or cause to be done what the law does not sanction or permit. Also, those dealing with an agent of the United States must be held to have had notice of the limitation of his authority."

This doctrine applies not only in civil matters, but also to criminal cases. In Sorrells v. United States (C.C.A.) 57 F.(2d) 973, 977, the court said:

"Upon no logical basis can the government, which represents the whole people, be held to be estopped from prosecuting one who has violated a law enacted for the protection of society; nor can justification be found for allowing one who

has knowingly violated such a law to go unwhipped of justice because his action has resulted from temptation by a government official. As was said by the Court of Appeals of New York in People v. Mills, 178 N.Y. 274, 70 N.E. 786, 791, 67 L.R.A. 131: 'While the courts neither adopt nor approve the action of the officers, which they hold was unauthorized, still they should not hesitate to punish the crime actually committed by the defendant. It is their duty to protect the innocent and punish the guilty. We are asked to protect the defendant, not because he is innocent, but because a zealous public officer exceeded his powers * * *.'"

See, also, Wilber Nat. Bank v. United States, 294 U.S. 120, 55 S.Ct. 362, 79 L.Ed. 798; Leavenworth, L. & G. R. Co. v. United States, 92 U.S. 733, 23 L.Ed. 634; Hawkins v. United States, 96 U.S 689, 24 L.Ed. 607; Whiteside v. United States, 93 U.S. 247, 23 L.Ed. 882; Langford v. United States, 101 U.S. 341, 25 L.Ed. 1010; Utah Power & Light Co. v. United States, 243 U.S. 389, 37 S.Ct. 387, 61 L.Ed. 791; Pine River Logging Co. v. United States, 186 U.S. 279, 22 S.Ct. 920, 46 L.Ed. 1164; Sutton v. United States, 256 U.S. 575, 41 S.Ct. 563, 65 L.Ed. 1099, 19 A.L.R. 403; Filor v. United States, 76 U.S.(9 Wall.) 45, 19 L.Ed. 549; Lee v. Munroe and Thornton, 11 U.S.(7 Cranch) 366, 3 L.Ed. 373; Gibbons v. United States, 75 U.S.(8 Wall.) 269, 19 L.Ed. 453; Hunter v. United States, 30 U.S.(5 Pet.) 173, 8 L.Ed. 86; 26 Ruling Case Law, "United States," § 25, page 1432.

We have no hesitancy in applying it to cases involving the deportation of aliens who have violated the criminal laws of the United States or of one or more of the states.

The subjects of deportation, naturalization, and immigration are all fully covered by statutes. The duties and powers, as well as the authority, of agents are defined. Nowhere is there authority given to a public official to grant a favor to an alien who seeks privileges in the face of the statutes. There has been criticism directed to nonflexibility of the deportation laws, to their failure to give discretion to some official to be exercised in cases where family ties are broken through deportation of one member. We have found no statute which gave authority to any official to grant to any alien, immunity from deportation after the order based on the commission of criminal offenses involving moral turpitude has been made. None has been suggested by counsel for appellant. In the absence of such express authority found in Congressional enactment, we are clearly satisfied that no agent or Government official is authorized to bind the Government by agreement to refrain from taking steps necessary to deport undesirable aliens who have violated criminal statutes of state or nation. It rested on counsel or the court to find the statute which granted such authority, and neither has apparently found one that gave such authority either expressly or impliedly. The Government has not even discussed this question in its brief, and we feel safe in concluding that no statutory authority exists.

It is hardly necessary in closing this subject to observe that it is only for the purpose of the argument that we have assumed that appellant could have shown the existence of an agreement, one part of which called for the dismissal of the deportation proceedings.

There is another reason for sustaining the District Court's action.

The order of deportation and the arrest of appellant occurred before the alleged agreement between appellant and the Government agent was made. The arrest was valid in view of the order which was clearly legal when made. Habeas corpus does not lie to review the effect of the alleged agreement subsequently negotiated upon an order valid upon its face and legal at the date of its pronouncement. The writ of habeas corpus is available only to challenge the validity of appellant's imprisonment. We have chosen, however, to consider the question which Judge Barnes squarely met and, as we believe, correctly decided.

The judgment is affirmed.