STATE of Wisconsin, EX REL., Elnora PARKER, Petitioner-Appellant,

Carol A. ARENDT, Petitioner,

v.

Patrick J. FIEDLER, in his capacity as Secretary of the Department of Corrections of the State of Wisconsin and Gerald Miles Turner, Jr., Respondents-Respondents.†

STATE of Wisconsin, EX REL. E. Michael MCCANN, District Attorney, Milwaukee County, Wisconsin, and Frederick G. Gordon, Alderman of the City of Milwaukee, Wisconsin, Petitioners-Appellants,

v.

Patrick J. FIEDLER, in his capacity as Secretary of the Department of Corrections of the State of Wisconsin and Gerald Miles Turner, Jr., Respondents-Respondents.

Court of Appeals

*No. 93–0709. Oral argument November 22, 1993.—Decided November 30, 1993.*

(Also reported in 509 N.W.2d 440.)

†Petition to review granted.

438

441

On behalf of the petitioners-appellants, the cause was submitted on the briefs of *E. Michael McCann*, district attorney; *Bruce J. Landgraf* of *Kersten & McKinnon, S.C.*; and *Fredrick Gordon*, of Milwaukee. Oral argument by *E. Michael McCann* and *Bruce J. Landgraf*.

On behalf of the respondent-respondent Patrick J. Fiedler, the cause was submitted on the briefs of

*Edward S. Marion* of *Murphy & Desmond, S.C.*, of Madison, Wisconsin. Oral argument by *Edward S. Marion*.

On behalf of the respondent-respondent Gerald M. Turner, Jr., the cause was submitted on the briefs of *Catherine M. Canright* of Milwaukee. Oral argument by *Catherine M. Canright*.

Before Sullivan, Fine and Schudson, JJ.

FINE, J. This is an appeal from the trial court's consolidated judgment dismissing proceedings commenced by the filing of petitions for writs of certiorari. Relators sought an order directing the secretary of the Department of Corrections to recalculate the mandatory release date of Gerald Miles Turner, Jr.

In 1975, Turner was convicted of violating secs. 940.02 (second-degree murder), 944.11(1) (indecent behavior with a child), 944.12 (enticing a child for immoral purposes), and 944.17(1) (sexual perversion), Stats. (1973), as the result of his sexual molestation and murder of nine-year old Lisa French. He was sentenced to serve an indeterminate term in the Wisconsin State Prisons of not more than thirty-eight and one-half years. Turner was released from prison on October 14, 1992, after serving fewer than eighteen years. The release was under the purported authority of section 53.11(7), Stats. (1973), which requires the release on parole of a prisoner who has "served the term for which he has been sentenced . . . less good time earned under this chapter and not forfeited as herein provided."[1]

---

[1] Section 53.11, Stats. (1973) provides:

**Credit for good conduct; forfeiture for bad; parole.** (1) The warden or superintendent shall keep a record of the conduct of each inmate, specifying each infraction of the rules. Each inmate who

shall conduct himself in a proper manner and perform all the duties required of him shall be entitled to good time or diminution of sentence according to the following table, prorated for any part of a year: First year, one month; second year, 2 months; third year, 3 months; fourth year, 4 months; fifth year, 5 months; every year thereafter, 6 months.

(2) Any inmate who violates any regulation of the prison or refuses or neglects to perform the duties required of him shall be subject to forfeiture of any good time previously granted or earned under this chapter, 5 days for the first offense, 10 days for the second offense and 20 days for the third or each subsequent offense. Good time so forfeited shall not be restored. In addition, the department, or the warden or the superintendent, with the approval of the department, may cancel all or part of such good time.

(2a) A parolee earns good time at the rate prescribed in this section. The department may forfeit all or part of the good time previously earned under this chapter, for violation of the conditions of parole, whether or not the parole is revoked for such misconduct.

(3) Whenever any inmate is committed under several convictions with separate consecutive sentences they shall be construed as one continuous sentence for the purpose of computing good time earned or forfeited under this section. All other sentences, whenever imposed, shall be deemed first sentences for purpose of computing good time; but no more good time shall be granted for any one year than is specified in subsection (1), as modified by section 53.12 (1).

(4) An inmate may waive his good time.

(5) The time during which an inmate who escaped is at large shall not be computed as time served.

(6) Allowances for good conduct earned in any institution shall be allowed in the institution to which an inmate may be transferred.

(7) (a) An inmate or parolee having served the term for which he has been sentenced for a crime committed after May 27, 1951, less good time earned under this chapter and not forfeited as herein provided, shall be released on parole or continued on parole, subject to all provisions of law and department regulations relating to paroled prisoners, until the expiration of the maximum term for which he was sentenced without deduction of such good time, or until discharged from parole by the department, whichever is sooner.

(b) Any person on parole under this subsection may be returned to prison as provided in s. 57.06 (3) or s. 57.07 (2) to serve

According to the petition filed by E. Michael McCann, district attorney of Milwaukee County, and Frederick G. Gordon, a member of the Milwaukee Common Council, Turner is an "unrepentant, apparently homicidal pedophile" whose "perverted lust perhaps unsated and certainly untreated for over a decade and a half behind bars" makes him extremely dangerous. These allegations have not been controverted. The McCann/Gordon petition further alleges, also without contradiction, that Turner has consistently been denied discretionary parole, and would not have been released from prison if the Department had not calculated Turner's good time in a way the Relators contend violates section 53.11, Stats. (1973).[2]

---

the remainder of his sentence. He may earn good time on the balance of such sentence while so in prison, subject to forfeiture thereof for misconduct as herein provided. Subject to the approval of the department, he may again be released on parole thereafter under either this section or s. 57.06 or s. 57.07, whichever is applicable. The remainder of his sentence shall be deemed to be the amount by which his original sentence was reduced by good time.

(8) Releases from the prisons, except those under ch. 57, shall be on the Tuesday or the Wednesday preceding the release date.

The parole-eligibility law was changed, effective for crimes committed on or after June 1, 1984, and now provides that a prisoner's mandatory-release date is "two-thirds of the sentence." *See* sec. 302.11(1) & (9), Stats.

[2] In a newspaper article attached as an exhibit to the McCann/Gordon petition, the secretary of the Department is quoted as saying that if he, the secretary, had his "druthers," Turner "would not be out." The article reports that the secretary explained that Turner was released because in the Department's view the law required it; otherwise, the Department would have kept Turner in prison "because he did not show remorse or motivation for treatment or rehabilitation." The Department has not disputed the accuracy of this report.

■ Relators' contention that the Department unlawfully calculated Turner's good time focuses on the Department's long-standing practice of awarding a prisoner the "good time" authorized by section 53.11(1), Stats. (1973) upon the prisoner's entry into prison, rather than as it is earned. This, the Relators contend, conflicts with the statute. In an oral decision, the trial court concluded that although the Relators had standing to challenge the Department's calculation of Turner's mandatory release date, the Department's calculation was not inconsistent with the statute. Our review is *de novo. See State v. Robertson*, 174 Wis. 2d 36, 41, 496 N.W.2d 221, 223 (Ct. App. 1993). For the reasons discussed below, we reversed the trial court's judgment on November 22, 1993.[3]

There are four issues on this appeal: first, whether the Relators have standing to maintain this action;

[3] On November 22, 1993, we issued the following order:

This is an appeal from the trial court's consolidated judgment dismissing proceedings commenced by the filing of petitions for writs of certiorari. Relators sought an order directing the secretary of the Department of Corrections to recalculate the mandatory release date of Gerald Miles Turner, Jr., so as to conform with the provisions of section 53.11, Stats. (1973). On November 22, 1993, this court heard oral argument by counsel. Following oral argument, and a careful consideration of the briefs submitted by the parties and Turner, the court has determined: (1) that the judgment must be reversed; and (2) that it would be contrary to the public interest and safety for the implementation of this decision to be delayed pending the drafting of a formal opinion. A written opinion that conforms with the requirements of section 752.41(1), Stats., will be provided expeditiously.

Upon the foregoing reasons,

IT IS ORDERED that the judgment of the trial court is reversed forthwith, and the case remanded forthwith to the trial court with directions that the relief requested in the petitions for writ of certiorari be granted forthwith.

second, whether certiorari is the appropriate remedy; third, whether the Department's formula conflicts with the statute; fourth, whether the Department's formula must be retained because of principles that implicate the prohibition against *ex post facto* laws.

1. *Standing.*

■

It is a fundamental tenet of our law that persons without a stake in a controversy lack standing to seek judicial resolution of that controversy. *See Mast v. Olsen*, 89 Wis. 2d 12, 16, 278 N.W.2d 205, 206-207 (1979); *see also Baker v. Carr*, 369 U.S. 186, 187, 204-208 (1962) (voters have standing to challenge the apportionment of the Tennessee General Assembly and the alleged resulting " 'debasement of their votes' " (citation omitted)). Although the concept of standing has been accurately described as " 'amorphous,' " *see Flast v. Cohen*, 392 U.S. 83, 99 (1968) (quoting Professor Paul A. Freund), certain principles are apparent from the cases.

> The Wisconsin rule of standing envisions a two-step analysis conceptually similar to the analysis required by the federal rule [of standing]. The first step under the Wisconsin rule is to ascertain whether the decision of the agency directly causes injury to the interest of the petitioner. The second step is to determine whether the interest asserted is recognized by law. This approach is similar to the two-pronged standing analysis outlined by the United States Supreme Court in *Data Processing Service v. Camp* [397 U.S. 150 (1970)] and *Barlow v. Collins* [397 U.S. 159 (1970)] as follows: (1) Does the

This procedure was recognized in *State v. Barnes*, 127 Wis. 2d 34, 37 n.1, 377 N.W.2d 624, 625 n.1 (Ct. App. 1985).

challenged action cause the petitioner injury in fact? and (2) is the interest allegedly injured arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question?

*Wisconsin's Environmental Decade, Inc. v. Public Serv. Comm'n*, 69 Wis. 2d 1, 10, 230 N.W.2d 243, 248 (1975) (footnotes omitted).

*Milwaukee Brewers Baseball Club v. Department of Health and Social Services*, 130 Wis. 2d 56, 65-70, 387 N.W.2d 245, 248-250 (1986), reaffirmed the two-step test enunciated in *Wisconsin's Environmental Decade*, and held that the Milwaukee Brewers had standing to challenge an environmental impact statement that approved the construction of a prison close to the Brewers' stadium. *Id.*, 130 Wis. 2d at 70, 387 N.W.2d at 250-251. The court determined that allegations that the prison would add to traffic congestion near the stadium was sufficient to give the Brewers standing because "increased traffic congestion" was one of the harms against which the Wisconsin Environment Protection Act protected. *Milwaukee Brewers*, 130 Wis. 2d at 69-70, 387 N.W.2d at 250. *Milwaukee Brewers* specifically noted that "[i]n Wisconsin, the law of standing is to be construed liberally," and that " '[w]here an actual injury is demonstrated, even a "trifling interest" may be sufficient to confer standing.' " *Id.*, 130 Wis. 2d at 64-65, 387 N.W.2d at 248 (citation omitted). Thus, as *Wisconsin's Environmental Decade* had explained a decade earlier:

> [T]he law of standing in Wisconsin should not be construed narrowly or restrictively. This court has held that the review provisions of ch. 227, Stats.,

448

are to be liberally construed. As Professor Kenneth Culp Davis has commented:

> "The only problems about standing should be what interests deserve protection against injury, and what should be enough to constitute an injury. Whether interests deserve legal protection depends upon whether they are sufficiently significant and whether good policy calls for protecting them or for denying them protection."

*Wisconsin's Environmental Decade*, 69 Wis. 2d at 13, 230 N.W.2d at 249 (footnotes omitted).

The federal law of standing similarly applies the doctrine in a way to open, rather than close, the doors to the courthouse. Although the federal cases are not binding on us, they "are certainly persuasive as to what the rule should be." *Wisconsin's Environmental Decade*, 69 Wis. 2d at 11, 230 N.W.2d at 248.

*Data Processing Service v. Camp*, 397 U.S. 150 (1970), permitted sellers of data-processing services to challenge a ruling by the Comptroller of the Currency that allowed national banks to offer data-processing as an ancillary service to their banking business. 397 U.S. at 151. As competitors of the banks' data-processing business, the sellers satisfied the "injury in fact" aspect of the test for standing. *Id.*, 397 U.S. at 152. In so holding, the Court departed from an earlier test that required as a condition of standing that the " 'the right invaded [be] a legal right,—one of property, one arising out of contract, one protected against tortious invasion, or one founded on a statute which confers a privilege.' " *Id.*, 397 U.S. at 153 (quoting *Tennessee Electric Power Co. v. Tennessee Valley Authority*, 306 U.S. 118, 137-138 (1939)). *Data Processing Service* explained that the

"legal interest test" more properly went to the merits of the dispute, and that the question of standing appropriately turned on "whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." 397 U.S. at 153. The Court explained:

> That interest, at times, may reflect "aesthetic, conservational, and recreational" as well as economic values. A person or a family may have a spiritual stake in First Amendment values sufficient to give standing to raise issues concerning the Establishment Clause and the Free Exercise Clause. We mention these noneconomic values to emphasize that standing may stem from them as well as from economic injury on which [the sellers of data-processing services] rely here.

*Id.*, 397 U.S. at 154 (citations omitted).

*Barlow v. Collins*, 397 U.S. 159 (1970), decided the same day as *Data Processing Service*, emphasized that judicial review of challenged agency action was the rule, not the exception, pointing out that "[t]he right of judicial review is ordinarily inferred where congressional intent to protect the interests of the class of which the plaintiff is a member can be found; in such cases, unless members of the protected class may have judicial review[, the] statutory objectives might not be realized." 397 U.S. at 167. Thus, *United States v. SCRAP*, 412 U.S. 669 (1973), upheld the standing of environmental groups to challenge the government's approval of a railroad freight rate surcharge because the surcharge allegedly "would discourage the use of 'recyclable' materials, and promote the use of new raw materials that compete with scrap, thereby adversely

affecting the environment by encouraging unwarranted mining, lumbering, and other extractive activities." *Id.*, 412 U.S. at 676. The Court noted that the groups had alleged sufficient personal impact to give them standing by contending that their members "used the forests, streams, mountains, and other resources in the Washington metropolitan area for camping, hiking, fishing, and sightseeing, and that this use was disturbed by the adverse environmental impact caused by the nonuse of recyclable goods brought about by a rate increase on those commodities." *Id.*, 412 U.S. at 685. Significantly, *SCRAP* held that the plaintiffs had standing even though the challenged agency action "allegedly has an adverse environmental impact on all the natural resources of the country. . . . [and that] all persons who utilize the scenic resources of the country, and indeed all who breathe its air, could claim harm similar to that alleged by the environmental groups here." *Id.*, 412 U.S. at 687. The Court declared in language particularly appropriate here:

> To deny standing to persons who are in fact injured simply because many others are also injured, would mean that the most injurious and widespread Government actions could be questioned by nobody. We cannot accept that conclusion.

*Id.*, 412 U.S. at 688. *SCRAP* is consistent with *Wisconsin's Environmental Decade*, which held that environmental groups and their members had standing to challenge an agency decision that allegedly endangered the environment by the agency's "failure to consider conservation alternatives to the proposed" system of allocating natural gas supplies, even though many other persons could claim similar injury. *See*

451

*Wisconsin's Environmental Decade*, 69 Wis. 2d at 17-19, 230 N.W.2d at 251-252. We analyze the Relators' standing with these principles in mind.

### a. *The Parker / Arendt petition.*

The petition for a writ of certiorari filed by the citizen-Relators alleges that Elnora Parker lives "within blocks" of the halfway-house facility to which Turner was released, and that Carol A. Arendt has a daughter who attends a school, which, according to the McCann/Gordon petition, is next door to the halfway house. The Parker/Arendt petition complains that Turner's release "at a time prior to his rehabilitation and prior to his Mandatory Release date, constitutes substantial damage [to them], who as citizens of the State of Wisconsin are entitled to protection from unreformed criminals until they are required by law to be released from imprisonment."

Laws enacted to control both crime and criminals are designed to protect individuals in society from predators who murder, rape, rob, burglarize, and otherwise unlawfully interfere with the right of every man, woman, and child to live their lives and pursue their dreams unmolested. The criminal law is thus akin to the environmental-protection laws, which are designed not only to protect nature from despoliation, but also to secure the people's right to enjoy nature, protected and preserved. *See Wisconsin's Environmental Decade*, 69 Wis. 2d at 17-18, 230 N.W.2d at 251-252. Both the criminal and environmental laws thus protect the "environment," and the citizen-Relators' interest in a safe and secure community is one "recognized by law," just as citizens' interests in a healthful environment are "recognized by law." Indeed, as pointed out

during oral argument by both counsel for the citizen-Relators, and by McCann, who appeared on behalf of Gordon and himself, there is no indication that the legislature values the community's safety concerns any less than it values the need to protect the community's air, land, and water. The second step in the two-step analysis identified by *Milwaukee Brewers* is thus satisfied. *See Milwaukee Brewers*, 130 Wis. 2d at 65, 387 N.W.2d at 248-249.

The first step of the two-step analysis, which inquires " 'whether the decision of the agency directly causes injury to the interest of the' " person seeking judicial redress, *id.*, 130 Wis. 2d at 65, 387 N.W.2d at 248 (citation omitted), is also satisfied. The Wisconsin Supreme Court "has construed the 'directly affected' requirement to include an injury 'which is remote in time or which will only occur as an end result of a sequence of events set in motion by the agency action challenged.' " *Id.*, 130 Wis. 2d at 69, 387 N.W.2d at 250 (quoting *Wisconsin's Environmental Decade*, 69 Wis. 2d at 14, 230 N.W.2d at 250). Although the injury must not be "hypothetical or conjectural," *Milwaukee Brewers*, 130 Wis. 2d at 65, 387 N.W.2d at 248, and one cannot say for certain that Turner will harm either the individual Relators or others in the community during the period of his parole, the record is uncontradicted that his mere presence in the community has adversely affected their sense of safety and security—the very interests the statutes regulating criminal conduct were designed to protect. Furthermore, it is not "conjectural" that persons released on mandatory parole, by definition those who have not been deemed fit for discretionary parole, present a substantial threat to the community. *See* George A. Mitchell, *Parole in Wis-*

*consin* (Wisconsin Policy Research Institute June 1992). Indeed, of 763 parolees readmitted to Wisconsin prisons in 1991, approximately 70% had violated the conditions of their mandatory parole. *Id.*, at 22.[4] The fact that the interests of Parker and Arendt are shared with others in their community, or even the state, does not deprive them of standing. *See SCRAP*, 412 U.S. at 687-688; *Flast*, 392 U.S. at 98-105 (taxpayers have standing to challenge expenditures alleged to violate the Establishment and Free Exercise clauses of the First Amendment). In fact, applying Professor Davis's analysis, adopted by *Wisconsin's Environmental Dec-*

---

[4] National statistics are equally grim:

> Many violent offenders entering prison would still have been in prison for a previous offense if they had completely served their prior sentence. For example, for those entering State prison in 1979, 20% of those entering for a violent offense—including 22% of those convicted of robbery and 23% of those convicted of assault—fell into this category.

UNITED STATES DEPARTMENT OF JUSTICE, BUREAU OF JUSTICE STATISTICS, VIOLENT CRIME IN THE UNITED STATES 15 (1991). *Cf.* UNITED STATES DEPARTMENT OF JUSTICE, BUREAU OF JUSTICE STATISTICS, BJS DATA REPORT, 1987 66 (1988) (Of the 1,781 persons under a sentence of death in state prisons at the end of 1986, "a fifth were on parole at the time of their capital offense."). In a submission to the trial court in this case, the Department estimates that there are 593 parolees who were released under the Department's interpretation of section 53.11, Stats. (1973).

In Wisconsin, the legislature has recognized the danger presented by paroled prisoners by requiring the Department to give pre-release notification to the sheriff of the county and to the police department of the municipality in which a person to be released on mandatory parole will reside, unless notice is waived by the law enforcement official or agency. Section 302.11 (5), Stats. Similar pre-release notice must also be given for those prisoners who are released on discretionary parole. Section 304.06(1)(g), Stats.

*ade,* there can be little doubt but that these interests "deserve protection against injury." *See id.,* 69 Wis. 2d at 13, 230 N.W.2d at 249. Parker and Arendt have standing to maintain this action.

b. *The McCann / Gordon petition.*

■

McCann is the district attorney in Milwaukee County. The primary function of the district attorney is to "prosecute all criminal actions" within his or her jurisdiction. Section 978.05(1), Stats. The district attorney is therefore specifically concerned with the potential for crime within his or her jurisdiction. Accordingly, McCann's interest in a safe and secure community is one "recognized by law," satisfying the second step of the two-step analysis used to determine standing. *See Milwaukee Brewers,* 130 Wis. 2d at 65, 387 N.W.2d at 248. As to the first step of the analysis, we have already noted, in part 1.a., that prisoners released on mandatory parole threaten the safety and security of the communities in which they reside. The crimes they commit have a direct impact on the district attorney and the legal responsibilities of his or her office. A premature release of mandatory parolees that is not permitted by the statute unnecessarily taxes the district attorney's resources and is "an end result of a sequence of events set in motion by the agency action challenged." *See Milwaukee Brewers,* 130 Wis. 2d at 69, 387 N.W.2d at 248. The first step of the two-step analysis is thus satisfied as well. McCann has standing to maintain this action.[5]

---

[5] In light of our determination that McCann has standing, we do not have to decide whether Gordon, the alderman representing the district into which Turner was released on parole,

## 2. *Certiorari.*

Certiorari is recognized by statute. Section 781.01, Stats. It is a civil action, *Irby v. Young*, 139 Wis. 2d 279, 281, 407 N.W.2d 314, 315 (Ct. App. 1987), and may be prosecuted either by petition, as was done here, or by complaint, sec. 801.02(5), Stats. Statutory certiorari may challenge the merits of a determination made by an administrative agency, *Browndale Int'l, Ltd. v. Board of Adjustment*, 60 Wis. 2d 182, 199, 208 N.W.2d 121, 129 (1973), *cert. denied*, 416 U.S. 936, and that determination will be overturned in a proceeding on certiorari if it "constitutes a clear violation of law," *Toebe Academy of Beauty Culture v. Kelly*, 239 Wis. 103, 107, 300 N.W. 476, 478 (1941). Thus, a petition for writ of certiorari was the procedure successfully used by the Milwaukee County district attorney in 1935 to challenge a prisoner's release on discretionary parole alleged to be unlawful because the district attorney had not received the requisite notice of the parole application. *State ex rel. Zabel v. Hannan*, 219 Wis. 257, 262 N.W. 625 (1935). *See also State ex rel. Milwaukee Medical College v. Chittenden*, 127 Wis. 468, 497, 107 N.W. 500, 509 (1906) (dental school could use certiorari to challenge the denial of dental licenses to its graduates even though it was not a party to the administrative proceedings).

The Department argues that certiorari is not appropriate here because release on mandatory parole is a ministerial act, and cites *State ex rel. Nelson v.*

has standing as a representative of his constituents. *See Gross v. Hoffman*, 227 Wis. 296, 300, 277 N.W. 663, 665 (1938) (only dispositive issue need be addressed).

456

*Emerson*, 137 Wis. 292, 296, 118 N.W. 836, 837 (1908), as support for the proposition that certiorari may not be used to review acts that are ministerial. It is true that release under section 53.11, Stats. (1973) is mandatory, but *only if* the prisoner has "served the term for which he has been sentenced . . . less good time earned under this chapter and not forfeited." Section 53.11(7)(a), Stats. (1973). If the Department has calculated good time in a way that contravenes the statute, such calculation is not ministerial but, rather, "a clear violation of law," reachable *via* certiorari. *See Toebe Academy of Beauty Culture*, 239 Wis. at 107, 300 N.W. at 478.

3. *The statute.*

The crux of this case is whether the Department's method of calculating good time under section 53.11, Stats. (1973), complies with the statute. Although the Department points to a number of cases referencing or mentioning the Department's interpretation of the statute, no case has previously considered a challenge to that interpretation.

A statute clear on its face must be applied as it is written, unless to do so would lead to an absurd result. *See State v. Burkman*, 96 Wis. 2d 630, 638, 642, 292 N.W.2d 641, 645, 647 (1980). Section 53.11, Stats. (1973), provides, as pertinent to this appeal:

> (1) The warden or superintendent shall keep a record of the conduct of each inmate, specifying each infraction of the rules. Each inmate who shall conduct himself in a proper manner and perform all the duties required of him shall be entitled to good time or diminution of sentence according to the following table, prorated for any part of a year: First

457

year, one month; second year, 2 months; third year, 3 months; fourth year, 4 months; fifth year, 5 months; every year thereafter, 6 months.

. . .

**(6)** Allowances for good conduct earned in any institution shall be allowed in the institution to which an inmate may be transferred.

. . .

**(7)** (a) An inmate or parolee having served the term for which he has been sentenced for a crime committed after May 27, 1951, less good time earned under this chapter and not forfeited as herein provided, shall be released on parole or continued on parole, subject to all provisions of law and department regulations relating to paroled prisoners, until the expiration of the maximum term for which he was sentenced without deduction of such good time, or until discharged from parole by the department, whichever is sooner.

For the reasons explained below, we conclude that this statute unambiguously requires that a prisoner earn good time before it is awarded. The Department, on the other hand, has, for many years, been awarding the good time before it is earned—and it did so with Turner. It points to its regulation applicable to those prisoners who fall within section 53.11, Stats. (1973), which provides that good time "shall be credited from the beginning date of the inmate's sentence." WIS. ADM. CODE sec. DOC 302.21(3)(a)2. Although, arguably, the regulation is not specifically contrary to the statute, because a *projection* of anticipated good time using the correct, statutorily mandated calculations could be made when a defendant enters prison, the Department does more than calculate a mere projection, it awards good time before it is earned. The Department's method of calculating good time for those prisoners

458

covered by section 53.11 is summarized by the Legal
Assistance to Institutionalized Persons Program man-
ual, submitted to the trial court by the Department:

> Although the statute is open to several interpreta-
> tions, the one used is the one most favorable to the
> inmate. Thus the first year is considered served
> after eleven months, the second year after ten more
> months, and so on. As a result, a five-year sentence,
> less "state" good time, is three years and nine
> months.

Although courts rightfully give deference to the
interpretation of statutes by administrative agencies
charged with their enforcement, this deference is not
given when "the agency's interpretation directly con-
travenes the words of the statute." *Lisney v. Labor &
Industry Review Commission*, 171 Wis. 2d 499, 505-
506, 493 N.W.2d 14, 16 (1992). Indeed, "[a]n adminis-
trative rule, even of long duration, may not stand at
variance with an unambiguous statute," *Basic Prod-
ucts Corp. v. Department of Taxation*, 19 Wis. 2d 183,
186, 120 N.W.2d 161, 162 (1963), because "[n]o agency
may promulgate a rule which conflicts with state law,"
sec. 227.10(2), Stats.

Section 53.11(7), Stats. (1973), unambiguously
provides that an inmate's stay in prison is determined
by subtracting from his or her sentence "good time
earned." A person cannot "earn" anything prospec-
tively; the dictionary defines "earn" as "to receive as
equitable return for work *done* or services *rendered*."
*Webster's Third New International Dictionary of the*

*English Language* 714 (1976) (emphasis added).[6] Indeed, analogous to the issue we have here, the dictionary notes that in the school context "earn" means: "to obtain (as a degree or a number of credits) at an educational institution by fulfilling the requirements and meeting definite standards." *Ibid.* The mandate of section 53.11(1), Stats. (1973), that "[e]ach inmate who shall conduct himself in a proper manner and perform all the duties required of him shall be entitled to good time or diminution of sentence according to the following table: First year, one month; second year, 2 months; third year, 3 months; fourth year, 4 months; fifth year, 5 months; every year thereafter, 6 months," when read in conjunction with section 53.11(7), thus means that the prisoner does not "earn" the first month of good time until the prisoner has completed the first year of confinement, and does not "earn" two additional months until the prisoner has completed the second year of confinement, and so on, *and* the "record of conduct" for the prisoner that is kept by the warden or superintendent reveals that the prisoner has "conduct[ed] himself in a proper manner and perform[ed] all the duties required of him," sec. 53.11(1), *during the relevant year*. Stated another way, just as a student is not awarded a diploma upon entrance into school, under the statute a prisoner may not be awarded good time upon his or her entrance into prison before that

[6] We are enjoined to read the words that do not have "a peculiar meaning in the law" according to their "common and approved usage." Section 990.01(1), Stats. The dictionary is an appropriate resource. *DNR v. Wisconsin Power & Light Co.,* 108 Wis. 2d 403, 408, 321 N.W.2d 286, 289 (1982). The word "earn" does not have "a peculiar meaning in the law"; a common legal dictionary defines it as "[t]o acquire by labor, service or performance." *Black's Law Dictionary* 508 (6th ed. 1990).

good time is "earned." [7] The Department's interpreta-

[7] Thus, in the example given by the excerpt from the Legal Assistance to Institutionalized Persons Program manual quoted earlier, the defendant sentenced to a five-year term of incarceration would serve slightly less than four years and two months, rather than the three years and nine months as represented by the manual. Under the plain language of section 53.11, Stats. (1973), the calculations are made as follows: If, during the first year of confinement, the prisoner conducts him- or herself "in a proper manner and perform[s] all the duties required," the prisoner will have earned "good time or diminution of sentence" of one month for that first year. Section 53.11 (1), Stats. (1973). Thus, after completion of that first year, the prisoner will have three years and eleven months left to serve (the five-year sentence, less the one year served plus the one month of good time earned during the first year). If the prisoner also earns good time by successfully completing the second year of confinement, he or she will then have two years and nine months left to serve (the five-year sentence, less the two years already served plus the one month of good time earned for the first year and two months good time earned for the second year). By the end of the third year of confinement, the prisoner who has earned good time under section 53.11 for that year will have to serve one year and six months (the five-year sentence, less the three years already served plus the one month of good time earned for the first year, the two months good time earned for the second year, and three months good time earned for the third year). At the end of the fourth year of confinement, the prisoner who has earned good time under section 53.11 for that year will have to serve two months (the five-year sentence, less the four years already served plus the one month of good time earned for the first year, the two months good time earned for the second year, three months good time earned for the third year, and four months good time earned for the fourth year). Under section 53.11(1), the prisoner is then entitled to have earned good-time credit prorated for the final two months at the rate for the fifth year. The Department has discretion how to

461

tion to the contrary, albeit of long-duration, is contrary to the statute and cannot stand.

### 4. *Alleged ex post facto application.*

Both the Department and Turner contend that nullifying the Department's unlawful interpretation of section 53.11, Stats. (1973), violates the prohibition against *ex post facto* laws. We disagree.

The legislature may not punish a person for doing something that was not criminal at the time. *See* U.S. CONST. art. I, § 9, cls. 3 & 10; WIS. CONST. art. I, § 12. Furthermore, the legislature may not impose a greater punishment for a crime than that which existed at the time the crime was committed. *Collins v. Youngblood*, 497 U.S. 37, 43 (1990) (*ex post facto* prohibition not violated by statute enacted after defendant committed his crime even though statute permitted reformation of an improper jury verdict in defendant's case, thereby validating his conviction); *State ex rel. Mueller v. Pow-*

---

calculate the proration, as long as good time is not awarded before it is earned. Thus, the Department would be free to award the prisoner either one-twelfth of five months after the prisoner successfully completes the first month of the fifth year of his or her sentence, or one-fifty-second of five months after the prisoner successfully completes the first week of the fifth year of the sentence. The significant aspect of this proration, however, is that an award for good time cannot be made before it is earned. By contrast, the computation in the example given by the Legal Assistance to Institutionalized Persons Program manual awards the prisoner nine months good-time credit for the fourth and fifth years, even though the prisoner never serves any part of those years, and, accordingly could not have "conduct[ed] himself in a proper manner and perform[ed] all the duties required of him," sec. 53.11(1), for those years.

*ers*, 64 Wis. 2d 643, 646-647, 221 N.W.2d 692, 693-694 (1974) (statute that retroactively increases the time a prisoner must serve before becoming eligible for parole violates the prohibition against *ex post facto* laws) (*per curiam*). Additionally, rules may not retroactively change a formula for computing good time so as to increase a prisoner's period of incarceration. *Miller v. Florida*, 482 U.S. 423, 428-429 (1987) (*ex post facto* prohibition violated by guidelines that increased presumptive sentence for crime after crime was committed); *State ex rel. Eder v. Matthews*, 115 Wis. 2d 129, 133, 340 N.W.2d 66, 68-69 (Ct. App. 1983). Mere retroactive alteration of circumstances to the defendant's disadvantage, however, does not violate the prohibition against *ex post facto* laws. *Collins*, 497 U.S. at 49-50 (overruling *Kring v. Missouri*, 107 U.S. 221 (1883)).

Although the prohibitions against *ex post facto* laws do not directly apply to the judiciary, "an unforeseeable enlargement of a criminal statute, applied retroactively, operates precisely like an *ex post facto* law" and violates due process. *Bouie v. City of Columbia*, 378 U.S. 347, 353 (1964). But the enlargement or modification must be "an *unforeseeable*" judicial construction of a statute so that the defendant lacked "fair notice" that his or her conduct was criminal. *See Marks v. United States*, 430 U.S. 188, 191-192 (1977) (emphasis added) (unforeseeable judicial expansion of the reach of obscenity statutes may not be retroactively applied). Indeed, as the United States Court of Appeals for the Fourth Circuit recently explained, "*Marks* turned on the fact that, at the time of the conduct for which they were charged, '[t]he defendant[s] could not suspect that [their] actions would later become crimi-

463

nal.' " *United States v. Ellen*, 961 F.2d 462, 466 (4th Cir. 1992) (quoting *Osborne v. Ohio*, 495 U.S. 103, 117 (1990), brackets by *Ellen*), *cert. denied*, 113 S. Ct. 217.

As Relators have pointed out, section 53.11 has its roots in section 4928 of the Revised Statutes of 1878, which required that the deputy warden "[a]t *the end of each month* . . . give a certificate of good conduct to each convict who shall require it, against whom is recorded no infraction of the rules of discipline; and upon each certificate, the warden may, at his discretion diminish the term of any convict sentenced for a specific time, not more than five days." (Emphasis added.) This "at the end of each month" requirement was carried over by chapter 348, sec. 13, of the Laws of 1919, which renumbered and amended section 4928 as section 53.11(1):

> The deputy warden shall keep a true record of the conduct of each convict, specifying each infraction of the rules of discipline. At the end of each month the said deputy shall give a certificate of good conduct to each convict who shall require it, against whom is recorded no infraction of the rules of discipline. Every convict who is now or may be hereafter confined in the state prison and shall conduct himself in a peaceful and obedient manner and faithfully perform all the duties required of him shall be entitled to a diminution of time from the term of his sentence, not exceeding the months specified in the following table, for the respective years of his sentence and pro rata for any part of a year, where the sentence is for more than a year. . . .

The table set the earned good time rate at one month for the first year of sentence, two months for the second year of sentence, three months for the third year of sentence, four months for the fourth year of sentence,

five months for the fifth year of sentence, and six months for "[e]very year thereafter." Laws of 1919, sec. 13. Significantly, a table appended to section 4928 of the Laws of 1917 calculated "good time" as did the Department in this case, and as set out in the example given in the Legal Assistance to Institutionalized Persons Program manual. This calculation part of the table was *deleted*, however, by section 13 of the Laws of 1919.

The Department's brief represents that its method of calculating good time that we strike down was in effect since at least 1917. It tells us that the language of section 53.11(1) "has remained largely the same since section 4928, Stats. (1917), and the computation of statutory good time thereunder has been consistent since its enactment." (Record reference to trial court's oral decision omitted.) That the Department's predecessors ignored: (1) the express "end of each month" requirement from the beginning; (2) the 1919 deletion of the table that purported to sanction the award of good time before it was earned; and (3) the plain meaning of section 53.11, Stats. (1973), however, does not mean that our ruling, albeit long in coming because the Department's interpretation was never challenged before, was "unforeseeable" so that Turner and others in his situation "could not suspect" that the automatic award of pre-earned good time was a boon to which they were not entitled. Indeed, this decision merely confirms what the statute has clearly required, at least since the amendment effectuated by the Laws of 1919. Accordingly, the due-process based arguments

advanced by both the Department and Turner are without merit.[8]

*By the Court.*—Judgment reversed.

---

[8] At oral argument, Turner's counsel advanced an estoppel-based argument to the effect that when Turner and others in his position entered prison they were told what their projected mandatory-release date would be based on the Department's method of calculating it. Estoppel, however, may not lie against the government, at least not under these circumstances. *See Wilber Nat'l Bank v. United States,* 294 U.S. 120, 123 (1935) ("[T]he general rule is that the United States are neither bound nor estopped by the acts of their officers and agents in entering into an agreement or arrangement to do or cause to be done what the law does not sanction or permit."); *see also United States ex rel. Sage v. District Director,* 82 F.2d 630, 631-633 (7th Cir. 1936) (alleged agreement between the "lady in red" and officials that she would not be deported if she fingered John Dillinger would not be enforced). *Cf. Department of Revenue v. Moebius Printing Co.,* 89 Wis. 2d 610, 639, 279 N.W.2d 213, 226 (1979) (estoppel not applied against the government when to do so "interferes with the police power for the protection of the public health, safety or general welfare"); *State v. Seigel,* 163 Wis. 2d 871, 885, 472 N.W.2d 584, 590 (Ct. App. 1991) ("A prosecutor is not empowered to bind the state to any agreement which permits persons to commit unlawful acts."). Simply put, it is not in the public interest that potentially dangerous felons be released from prison before the law, as enacted in unambiguous terms by the legislature, requires.