DEPARTMENT OF REGULATION & LICENSING, Petitioner-Appellant,

v.

STATE OF WISCONSIN MEDICAL EXAMINING BOARD and George E. Farley, M. D., Respondents-Respondents.

Court of Appeals

*No. 97–0452. Submitted on briefs September 9, 1997.—Decided November 20, 1997.*

(Also reported in 572 N.W.2d 508.)

On behalf of the petitioner-appellant, the cause was submitted on the briefs of *John C. Temby* of Madison.

On behalf of the respondent-respondent, State of Wisconsin Medical Examining Board, the cause was submitted on the brief of *James E. Doyle*, attorney general, and *Bruce A. Olsen*, assistant attorney general.

On behalf of the respondent-respondent, George E. Farley, M.D., the cause was submitted on the brief of *Michael P. Malone* and *Susan R. Tyndall* of *Hinshaw & Culbertson* of Milwaukee.

Before Eich, C.J., Dykman, P.J., and Deininger, J.

DYKMAN, P.J. The Wisconsin Department of Regulation and Licensing appeals from a circuit court order affirming a decision of the State Medical Examining Board. The board had dismissed the department's disciplinary action against George E. Farley, M.D., a radiologist. The department argues that the board's factual findings do not support its conclusion that Farley's failure to observe a bone fracture in a leg x-ray and his failure to observe an abnormality in a colon x-ray was not "negligence in treatment," as that term is used in § 448.02(3), STATS. We find no error in the

190

board's conclusion that Farley's failure to observe the abnormalities in the x-rays was not "negligence in treatment." Accordingly, we affirm.

## BACKGROUND

In September 1993, the Wisconsin Department of Regulation and Licensing filed a complaint against Dr. Farley, alleging that Farley's failure to observe a bone fracture in a leg x-ray and his failure to observe an abnormality in a colon x-ray was "negligence in treatment" under § 448.02(3), STATS. On October 26, 1995, after a three-day hearing, an administrative law judge (ALJ) filed a proposed decision. On December 21, 1995, after hearing the parties' objections to the proposed decision, the Medical Examining Board concluded that there was insufficient evidence in the record to establish that Farley's acts or omissions constituted "negligence in treatment."

The board found that on October 14, 1987, "Patient A" was transported to the emergency room at St. Michael's Hospital in Milwaukee for injuries sustained in a moped accident. Among other problems, Patient A suffered scraping and bruising of his left knee and complained of left knee pain. Dr. Farley interpreted x-rays of Patient A's left knee and reported that "[t]he views of the left knee suggest a small joint effusion. The study indicates no evidence of fracture." Patient A was discharged from St. Michael's on October 15, 1987.

On November 2, 1987, Patient A visited Dr. David Mellencamp, an orthopedic surgeon, complaining that his left knee was swollen and painful and that he was unable to move it well. Dr. Mellencamp interpreted the x-rays from St. Michael's Hospital to show a large free fragment.

The ALJ's proposed decision provided that "[t]he abnormality [in Patient A's x-rays] was not obvious; but rather, extremely subtle and difficult to detect by the average radiologist." The board excised this language and substituted: "The abnormality should be detected by the average radiologist." In rejecting the ALJ's proposed finding, the board relied on the expert opinion of Dr. George Roggensack, who, after reviewing the x-rays of Patient A, testified: "[I]n this case, it is more than a sliver of bone. It's a fairly large bone fragment. So I believe it's apparent on these radiographs that there is an abnormality that can be perceived."

The board also found that on December 5, 1986, "Patient B" was referred to Dr. Farley at St. Michael's Hospital for a barium enema single-contrast. Patient B had a history of abdominal pain. Dr. Farley interpreted the colon x-ray to be normal. The board found, however, that "the colon x-ray of Patient B interpreted by Dr. Farley did show a contour abnormality in the medial wall of the proximal descending colon just below the splenic flexure, which Dr. Farley failed to detect." On February 12, 1988, Patient B underwent a colonscopy at St. Luke's Hospital, which revealed a stricture most compatible with a malignancy. On February 19, 1988, Patient B underwent colon resection for suspected carcinoma of the colon. The surgeon found a large tumor with aggressive growth and contiguous spread. Patient B underwent follow-up treatment for colon cancer, but died on January 20, 1990.

The ALJ's proposed decision provided that "[t]he abnormality [in Patient B's x-rays] was not obvious; but rather, subtle and difficult to detect by the average radiologist. Its detection upon the x-ray was made more difficult by virtue of the location of the abnormality and the physically large size of Patient B." The

192

board excised this language and substituted: "The abnormality should be detected by the average radiologist." Again, the board relied on the opinion of Dr. Roggensack, who testified:

> I think that the radiologic findings that we see in this lesion are very typical of a malignant lesion of the colon. I think it's a fairly obvious lesion; I think it's a fairly large lesion, and I believe [it] meets many of the classic radiologic findings for a malignant cancer or malignant lesion of the colon.

Despite finding that the average radiologist should have detected the abnormalities present in the x-rays of Patient A and Patient B, the board concluded that Dr. Farley's failure to notice the abnormalities was not "negligence in treatment." The board reasoned:

> For while the board concludes that the average radiologist should have been able to detect these defects, the board also concludes that Dr. Farley's failure to detect them in this instance did not constitute negligence in treatment. Stated another way, Dr. Farley's failure to detect the defects in these radiographs were mistakes, but they were not mistakes based upon negligence.
>
> The record is devoid of any evidence or suggestion that Dr. Farley is anything but a fully competent, careful and conscientious radiologist, or that he was not competent, careful and conscientious in his examination of the affected radiographs in this case. . . .
>
> . . . .
>
> The thrust of the expert testimony in this case went to whether the defects in these radiographs were obvious or subtle, and whether the "average" radiologist should have detected them. There is no evidence in this record, however, to establish that

> Dr. Farley's errors in having failed to detect those defects came as a result of his failure to conform to the accepted standard of care in the field of radiology, other than the conclusory testimony of Dr. Roggensack. . . .
>
> . . . .
>
> The problem with [Dr. Roggensack's] testimony . . . is that the simple fact of Dr. Farley's having failed to perceive defects that could have been perceived in these radiographs does not establish that he failed to conform to acceptable standards of practice in the manner in which he read them. . . .
>
> . . . .
>
> There is insufficient evidence in the record of this case to establish that Dr. Farley failed to conform to the accepted standard of care for radiologists in reading the radiographs of patients A and B, and no finding of negligence may therefore be made.

Because the board concluded that Dr. Farley's failure to recognize the abnormalities was not "negligence in treatment," it ordered that the disciplinary proceeding against Dr. Farley be dismissed.

The department filed a petition for a rehearing, which the board denied. The department sought review of the board's decision in the circuit court under Chapter 227, STATS. The circuit court affirmed the board's decision, and the department appeals.

## DISCUSSION

The department argues that the board erred in concluding that Dr. Farley's failure to observe the abnormalities in the x-rays was not "negligence in treatment" under § 448.02(3), STATS. Section 448.02(3)(a) provides that the board must investigate allegations of negligence in treatment by persons hold-

ing a license, certificate or limited permit granted by the board. If the board finds during its investigation that there is probable cause to believe that the person is guilty of negligence in treatment, the board must hold a hearing on such conduct. Section 448.02(3)(b). If the board finds a person guilty of negligence in treatment, it may warn or reprimand that person, or limit, suspend or revoke any license, certificate or limited permit granted by the board to that person. Section 448.02(3)(c).

■

To review the board's decision, we must first determine the definition of "negligence in treatment." The board and Dr. Farley argue that we should give great weight to the board's interpretation of § 448.02(3), STATS. We apply one of three standards of deference to an administrative agency's conclusions of law: great weight deference, due weight deference, and *de novo* review. *UFE Inc. v. LIRC*, 201 Wis. 2d 274, 284, 548 N.W.2d 57, 61 (1996). "Which level is appropriate 'depends on the comparative institutional capabilities and qualifications of the court and the administrative agency.' " *Id.* (quoting *State ex rel. Parker v. Sullivan*, 184 Wis. 2d 668, 699, 517 N.W.2d 449, 461 (1994)).

In support of its argument that we should give great weight to its interpretation of § 448.02(3), STATS., the board cites *Kelly Co. v. Marquardt*, 172 Wis. 2d 234, 244, 493 N.W.2d 68, 73 (1992), which provides that "if the administrative agency's experience, technical competence, and specialized knowledge aid the agency in its interpretation and application of the statute, the agency determination is entitled to 'great weight.' " The board contends that its experience, technical competence and specialized knowledge of the requirements

to practice medicine and surgery entitle its determination to great weight.

■

The test for determining whether an agency's conclusion of law should be entitled to great weight deference was modified by *UFE Inc. v. LIRC*, 201 Wis. 2d 274, 548 N.W.2d 57 (1996). That case provides that we give great weight deference to an agency's conclusions of law only when all four of the following requirements have been met:

> (1) the agency was charged by the legislature with the duty of administering the statute; (2) that the interpretation of the agency is one of long-standing; (3) that the agency employed its expertise or specialized knowledge in forming the interpretation; and (4) that the agency's interpretation will provide uniformity and consistency in the application of the statute.

*Id.* at 284, 548 N.W.2d at 61 (quoting *Harnischfeger Corp. v. LIRC*, 196 Wis. 2d 650, 660, 539 N.W.2d 98, 102 (1995)).

Under this standard, it is clear that the board's interpretation of § 448.02(3), STATS., is not entitled to great weight. The board's interpretation of "negligence in treatment" is not one of long-standing. In his proposed decision, the ALJ stated: "Neither the board nor the case law appear to have previously considered the precise meaning of the phrase 'negligence in treatment' as it applies within this disciplinary context." And although the board has expertise and specialized knowledge in determining whether one is qualified to practice medicine and surgery, it does not have expertise in defining negligence.

196

An agency's legal interpretation is entitled to due weight deference "when the agency has some experience in an area, but has not developed the expertise which necessarily places it in a better position to make judgments regarding the interpretation of the statute than a court." *UFE*, 201 Wis. 2d at 286, 548 N.W.2d at 62. Again, the board interpreted the term "negligence in treatment" here as a matter of first impression. Because the board does not have any experience in interpreting that term, its interpretation is not entitled to due weight.

The remaining level of deference is no deference, or *de novo* review. "An agency's interpretation of a statute will be reviewed *de novo* if any of the following are true: (1) the issue before the agency is clearly one of first impression; (2) a legal question is presented and there is no evidence of any special agency expertise or experience; or (3) the agency's position on an issue has been so inconsistent that it provides no real guidance." *Coutts v. Wisconsin Retirement Bd.*, 209 Wis. 2d 655, 664, 562 N.W.2d 917, 921 (1997) (footnotes omitted). Here, the board's interpretation is clearly one of first impression, and the board does not have any special expertise or experience in defining "negligence in treatment." Accordingly, we will not defer to the board's interpretation of "negligence in treatment."

Although the board's interpretation of "negligence in treatment" is not entitled to deference, we do not believe that the board erred in its interpretation. The parties and the board agreed to use the civil standard for medical negligence, as enunciated in WIS J I-CIVIL 1023, in defining "negligence in treatment." We do not see any reason to depart from the civil standard for

medical negligence when determining whether, for disciplinary purposes, a physician was negligent in treating a patient. Wisconsin courts have been developing the civil standard for medical negligence for over a century,[1] and the legislature has provided that "a finding by a court that a physician has acted negligently in treating a patient is conclusive evidence that the physician is guilty of negligence in treatment." Section 448.02(3)(b), STATS. We would create inconsistency and confusion in the board's application of the "negligence in treatment" standard were we to define "negligence in treatment" to mean anything other than medical negligence as defined by Wisconsin's courts.

The board quoted applicable Wisconsin medical negligence law when it stated:

> A physician is not an insurer of the results of his diagnosis or procedures. He is obliged to conform to the accepted standard of reasonable care, but he is not liable for failing to exercise an extraordinary degree of care.
>
> True, physicians too often have attempted to encourage the aurae of an infallibility they do not possess. Theirs is not an exact science, and even the very best of them can be wrong in diagnosis or procedure. The question, however, is not whether a physician has made a mistake; rather, the question is whether he was negligent. Unless the untoward result was caused by the failure to conform to the accepted standard of care, he is not liable in negligence for damages.

*Francois v. Mokrohisky*, 67 Wis. 2d 196, 201, 226 N.W.2d 470, 472 (1975). By quoting this passage, the board recognized that Dr. Farley was held to a standard of reasonable care. The board concluded that the

---

[1] *See, e.g., Reynolds v. Graves*, 3 Wis. 371 [*416] (1854).

evidence was insufficient to establish that Dr. Farley failed to conform to the accepted standard of care for radiologists in reading the x-rays.

The department contends that the board's conclusion that Dr. Farley was not negligent in treatment is incongruent with its finding that the abnormalities should have been detected by the average radiologist. But the court in *Nowatske v. Osterloh*, 198 Wis. 2d 419, 441–42, 543 N.W.2d 265, 273–74 (1996), explained that "average physician" is not synonymous with "reasonable physician":

> The fallacy in the "average" formulation is that it bears no intrinsic relation to what is reasonable. . . . "[T]hose who have less than . . . average skill may still be competent and qualified. Half of the physicians of America do not automatically become negligent in practicing medicine . . . merely because their skill is less than the professional average."
>
> . . . .
>
> . . . Reasonable care cannot be established by determining whether a physician provided care above or below the mean of the medical profession, but rather must be determined by assessing whether a patient received the standard of care he or she might reasonably expect from that practitioner, with due regard for the state of medical science at the time of treatment.

(Footnote omitted.)
■

Furthermore, even if Dr. Farley were held to an "average physician" standard as opposed to a "reasonable physician" standard, the board's finding that an average physician should have detected the abnormalities would not necessitate a conclusion that Dr. Farley was negligent. In determining whether a physician

was negligent, the question is not whether a reasonable physician, or an average physician, should have detected the abnormalities, but whether the physician used the degree of skill and care that a reasonable physician, or an average physician, would use in the same or similar circumstances. *See Zintek v. Perchik,* 163 Wis. 2d 439, 461, 471 N.W.2d 522, 530 (Ct. App. 1991), *overruled on other grounds, Steinberg v. Jensen,* 194 Wis. 2d 439, 534 N.W.2d 361 (1995).

■

A radiologist may review an x-ray using the degree of care of a reasonable radiologist, but fail to detect an abnormality that, on average, would have been found. The circuit court explained:

> The department's insistence that Dr. Farley's failure to detect the abnormalities on the x-rays constituted negligence is . . . undermined by the expert testimony in this case. All of the experts explained that radiologists simply cannot detect all abnormalities on all x-rays. The experts explained the phenomena of "errors in perception" which occur when a radiologist diligently reviews an x-ray, following all the proper procedures and using all the proper techniques, and fails to perceive an abnormality which, in retrospect, is apparent. The experts explained several reasons for errors in perception, including: (1) humans differ in their perceptions of a single item, (2) the finding of one object may cause a physician to overlook another abnormality, and (3) the patient's body structure may make an abnormality more difficult to detect. All of the experts testified that errors in perception by radiologists viewing x-rays occur in the absence of negligence. The medical literature relied on by the experts states that in controlled tests, radiolo-

gists miss a certain percentage of abnormalities despite using extraordinary efforts.

Therefore, the board's finding that Dr. Farley conformed to the accepted standard of care for radiologists, yet failed to detect abnormalities that an average radiologist should have detected, is not erroneous.

The department contends that the board found that the abnormalities were obvious. The department argues that the board erred in concluding that Dr. Farley was not negligent in failing to see abnormalities that were obvious. In support of its argument, the department cites WIS J I-CIVIL 1070, which provides:

> A person who has the duty of keeping a lookout must look with such attention and care as to see what is in plain sight. [If a person looks and does not see what is in plain sight, the person did not keep a proper lookout, and the person is just as negligent as if the person did not look at all.]
>
> [The duty to look means to look efficiently. A person who looks and fails to see what is in plain sight is in precisely the position he or she would be in if he or she did not look at all.]

(Brackets in original.)

We do not need to determine whether WIS J I-CIVIL 1070 applies to medical negligence cases because we disagree with the department's contention that the board found the abnormalities to be "obvious." The board did not find that the abnormalities were "obvious." The board did reject the ALJ's proposed findings that the abnormalities were "not obvious," but rather "subtle and difficult to detect by the average radiologist." But the fact that the board rejected the notion that the abnormalities were not obvious, but subtle and difficult to detect, does not mean that the board found that the abnormalities were obvious. Abnormalities

can be apparent to radiologists in differing degrees, and therefore an abnormality that is not difficult to detect does not automatically become obvious. If the board thought that the abnormalities were obvious, it could have so concluded. It did not, concluding only that the abnormalities "should be detected by the average radiologist."

The department argues that the board erred in concluding that an "error of perception" cannot be negligence. But the board did not conclude that an error of perception cannot be negligence. Rather, the board concluded that Dr. Farley's errors of perception were not caused by his failure to adhere to the accepted standard of care for radiologists.

Finally, the department argues that the board erred in considering evidence of Dr. Farley's competence and habits of practice in determining that he exercised reasonable care. The department contends that evidence of habit and general competence is irrelevant in determining whether a physician was negligent in a specific instance. But the board did not rely on Dr. Farley's habits of practice and general competence in determining that his failure to detect the abnormalities did not constitute "negligence in treatment." In its decision, the board determined that, other than the testimony of the department's expert, "[t]here is no evidence in this record . . . to establish that Dr. Farley's errors in having failed to detect those defects came as a result of his failure to conform to the accepted standard of care in the field of radiology." The board rejected the opinion of the department's expert. Ultimately, the board found that "[t]here is insufficient evidence in the record of this case to establish that Dr. Farley failed to conform to the accepted standard of care for radiolo-

gists in reading the radiographs of patients A and B, and no finding of negligence may therefore be made."

In addition to reviewing evidence of the standard of care that Dr. Farley used in reviewing the x-rays at issue, the board also looked to Dr. Farley's competence, abilities and work habits to determine whether he had engaged in a pattern of errors from which negligence in practice could be inferred. The board found that "[t]his record is devoid of any evidence or suggestion that Dr. Farley is anything but a fully competent, careful and conscientious radiologist, or that he was not competent, careful and conscientious in his examination of the affected radiographs in this case." From the record, the board concluded that it could not infer negligence from Dr. Farley's general habits or competence. Considering the fact that the board did not find sufficient direct evidence of negligence in the record, it was not erroneous for the board to look to Dr. Farley's general habits and competence to see if negligence could be inferred.

*By the Court.*—Order affirmed.